## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JEANMARIE BRISCELLA,** | : | |
| **Plaintiff,** | : | |
| | : | **Civil Action** |
| **v.** | : | **No. 16-614** |
| | : | |
| **UNIVERSITY OF PENNSYLVANIA** | : | |
| **HEALTH SYSTEM, d/b/a/** | : | |
| **PENN MEDICINE,** | : | |
| **Defendant.** | : | |

## MEMORANDUM

**MCHUGH, J.**                                                **DECEMBER 3, 2018**

Plaintiff Jeanmarie Briscella brings this action against Defendant University of Pennsylvania Health System ("Penn Medicine") for unlawful "reverse-race" discrimination and retaliation under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964 ("Title VII"), gender based discrimination and retaliation under the Equal Pay Act ("EPA") and Title VII, and the failure to pay overtime in compliance with the Fair Labor Standards Act ("FLSA") and Pennsylvania Minimum Wage Act ("PMWA"). Penn Medicine moved for Partial Summary Judgment on Briscella's discrimination and retaliation claims, as well as any claims for hostile work environment. In response, Ms. Briscella withdrew her gender discrimination claims under the EPA and Title VII and has not asserted any claims for hostile work environment, limiting the present motion to her remaining discrimination and retaliation claims.

After careful review of the voluminous record and consideration of the factual disputes raised by Briscella, I conclude that she has not presented sufficient evidence in the record that Penn Medicine's reasons for changing her shift, ceasing scheduling accommodations for her class schedule, or denying her a promotion were motivated by discriminatory animus. Briscella

has, however, presented sufficient evidence of retaliatory animus for the shift change and non-promotion. Accordingly, I grant Defendant's motion as to Plaintiff's discrimination claims but deny Defendant's motion as to Plaintiff's retaliation claims.

## I.    FACTUAL RECORD[1]

Jeanmarie Briscella is a White woman currently employed by Penn Medicine as a Communication Specialist in its call center and has been in that position since her initial hire in April 2007. Am. Comp. 3 ¶ 10, ECF No. 17; Pl.'s Dep. 6:12–15. Sophia Douglas, who manages the call center, hired Briscella in 2007 and has been her direct manager ever since. Def.'s Ex. 7 at 83, ECF No. 31-3. Tammy Stewart has served as an informal supervisor in the call center since approximately 2008 and is responsible for setting the work schedule, approving scheduling requests, and reviewing performance metrics for communication specialists. Stewart Dep. 8:12–16. Douglas reports to Amy Zylstra, the Director of the call center, who oversees the call center's finances, business strategies, technology, and its roughly 100 employees. Zylstra Dep. 7:1–13. Joann Crowley is a Human Resources Manager and served as a contact for the call center during all times relevant to Briscella's claims. Crowley Dep. 8:12–19, 13:11–14:6. Stewart and Douglas are Black, and Zylstra and Crowley are White.[2] Am. Comp. 3–4 ¶ 14–16, ECF No. 17; Pl.'s Dep. 140:19–20. Stewart and Douglas are the only active managers of the call center; Zylstra is not normally involved with supervision. Thomas-Clark Dep. 24:2–25:24, 38:10–14; Ford Dep. 18:7–21:6; Smalls Dep. 28:2–29:20.

---

[1] In considering all evidence in the light most favorable to Briscella, I have given careful consideration to each issue highlighted in Briscella's Response, Counter–Statement of Material Facts, and Response to Penn Medicine's Statement of Facts. Because of the nature of Briscella's claims, the considerable factual record is recited here in careful detail.

[2] In using the descriptions "White" and "Black," I emulate the Third Circuit's opinion in *Iadimarco v. Runyon*, 190 F.3d 151 (3d Cir. 1999) (McKee, J.).

The call center is located at 3930 Chestnut Street, Philadelphia, PA 19104, close to the hospitals it serves and to an area of Philadelphia that has a majority Black population. Def.'s Ex. 7, 8, ECF No. 31-3.[3] The call center never closes so employees are assigned according to three scheduled shifts: First Shift from 7a.m. to 3:30p.m., Second Shift from 2:30p.m. to 11p.m., and Third Shift for the remaining time in the day. Douglas Dep. 41:22–42:9. The call center is staffed by roughly 40 communication specialists who all work on a single floor, divided into three groups each assigned to a different hospital: Presbyterian, Hospital of the University of Pennsylvania, or Pennsylvania Hospital. Pl.'s Dep. 42:20–24; Thomas-Clark Dep. 33:2–4; Douglas Dep. 17:24–18:4. Over the past several years the call center staff has been roughly five percent White; presently 2 of the 40 communication specialists employed by Penn Medicine are White: Ms. Briscella and Larry Bujas. Douglas Dep. 17:4–18:3. In 2015 and 2016, Douglas hired between 12 and 17 communication specialists, all of whom were Black except one who was Latino. Douglas Dep. 21:1–22:20. Upon investigating allegations by Briscella that the racial make-up of the office was skewed in mid-2016, Crowley was surprised by these demographics, and agreed with Briscella that the office was disproportionately staffed by Black employees. Pl.'s Ex. J, at 6 ¶ 6.

Other employees testified that Douglas and Stewart had "favorite" and "non-favorite" employees. Smalls Dep. 51:5–9; Ford Dep. 21:17–22:6. Ronel Montgomery, another communication specialist, was viewed as a favorite while Briscella was decidedly in the non-favorite category. Smalls Dep. 48:9–24, 51:5–9; Ford Dep. 22:13–16. Several of Briscella's coworkers witnessed her receive worse treatment from Douglas and Stewart than anyone else,

---

[3] Briscella challenges the admissibility of census data but gives no basis for the challenge. Pl.'s Resp. Opp. Def.'s Stat. Fact. ¶ 10, ECF No. 39-2. I find the census data admissible, as it is relevant that West Philadelphia has a significant Black population, even though its probative value is somewhat limited without more specific labor pool analysis.

including being screamed at, having her desk banged on, and receiving discipline in circumstances when others would not. Kelly Dep. 230:23–231:15; Smalls Dep. 93:22–24; Norris Dep. 98:20–103:17. When plaintiff filed her Complaint, she supported it with four "Declarations" from Black employees supporting her claim of racial discrimination. Am. Comp. Ex. B, ECF No. 17. But these Declarations did not withstand the scrutiny of examination at deposition. Upon questioning, none of Briscella's coworkers would attribute her treatment to the fact that she was White.[4] Smalls Dep. 57:11–13; Norris Dep. 97:13–20; Ford Dep. 27:21–28:5; Thomas-Clark Dep. 47:5–18. Rather, several coworkers offered alternative theories for her mistreatment, including her abrupt use of family leave time, personal animosity between Briscella and management due to her questioning decisions, and her non-confrontational personality. Kelly Dep. 231:16–20; Norris Dep. 91:11–25; Ford Dep. 37:22–38:6. The only other White communication specialist, Larry Bujas, wrote a letter at the end of September 2014 praising both Douglas and Stewart's management of the call center in response to other employees voicing grievances about working conditions.[5] Def.'s Ex. 10, at 891, ECF No. 31-3. Ostensibly, other coworkers were afraid of speaking up about issues in the workplace for fear of retaliation. If communication specialists questioned practices in the office that seemed to run

---

[4] Smalls does not recant her declaration as clearly as the other declarants, but her testimony fails to support her opinion that there was racial discrimination because it lacks a factual foundation. Ms. Smalls initially identified discrimination by Douglas, as a Jamaican American, only against "African American women" in the call center, whom she treated "disrespectfully." Smalls Dep. 60:5–22. When asked about Plaintiff specifically, she offered only that Douglas exhibited a greater degree of disrespect toward her, causing Ms. Briscella to react defensively. As noted below, I find this sufficient for Plaintiff's retaliation claims but insufficient to prove racial animus in the context of the entire record.

[5] Plaintiff argues that Bujas' letter commending Douglas and Stewart is inadmissible character evidence under Fed. R. Evid. 404. I disagree. The letter expresses a lay opinion about their performance and is relevant because it recounts the favorable impressions of a fellow employee who presumably would also have been the target of any racial animus against Whites in the workplace.

counter to "federal law and Penn policy" they were worried about being made an example and thrown into the "dislike" group.  Smalls Dep. 98:12–18; Thomas-Clark Dep. 47:11–13.

At the end of May 2014, Briscella complained to management about male-female pay equality, specifically that "males were paid" more than her even though she had trained those male coworkers.  Pl.'s Dep. 91:2–8, 95:25–96:3.  Crowley confirmed that Briscella had complained about pay-based gender discrimination in mid-2014.  Crowley Dep. 27:9–28:14.  Several days later, Douglas sent a seemingly petulant email to all of the employees in the call center stating that "[o]ver the last week or so, there has [sic] been side bar discussions in the Call Center regarding pay rates, but only one person has addressed the issue with me."  Am. Comp. Ex. A, ECF No. 17.  Douglas went on to say that "it is absurd that employees were pressured to disclose their pay rate.  In the future if anyone insist [sic] that you disclose your personal information, please refrain from doing so."  *Id.*  Around August 25, 2014, Briscella saw on the posted schedule that she had been switched from her normal shift (Second Shift) to First Shift.  Pl.'s Dep. 205:7–19.  Briscella went to Stewart about the change, who explained that Ronel Montgomery had requested the Second Shift so that she could home-school her children.  Pl.'s Dep. 205:20–25.  Nearly a year prior, on August 6, 2013, Briscella had sent an email to Stewart requesting to work the First Shift for a couple of weeks, and to be switched to the First Shift permanently on the weekends.  Pl.'s Ex. 11 at 174.  Over the course of 2013, Briscella asked to switch with a colleague in order to work the First Shift approximately 28 times, including 17 times on weekends.  Pl.'s Ex. 12 at 518–565.  The last time she requested a switch to the First Shift was in October 2013.  *Id.*

After the Shift Change, Briscella complained in August and September 2014[6] to Douglas and Stewart that she felt she had been racially discriminated against because Stewart had "uprooted" her life "at a whim" to accommodate a Black colleague (Montgomery) without regard for the impact it would have on Briscella. Pl.'s Ex. E, ¶ 2. Later in the fall, on November 19, 2014, Briscella was issued written counseling for "unprofessional conduct" when she refused Stewart's request for Briscella's school username and password to view her class schedule on the internet. Pl.'s Dep. 243:21–24. Stewart issued the counseling because she believed Briscella's body language was unprofessional in response to this request. Stewart Dep. 19:24–20:19.

Earlier in 2014, Briscella had applied to continue using Penn Medicine's tuition assistance program so that she could attend a nursing program beginning in January 2015. Pl.'s Ex. Y. After the abrupt shift change, her schedule in relation to her classes became a point of contention with Stewart. Pl.'s Dep. 213:24–214:2. On December 31, 2014, Briscella emailed Stewart her school schedule, which required her to go to classes on Mondays, Tuesdays, and Thursdays during the First Shift and requested to be put back on the Second Shift. Pl.'s Ex. BB; Pl.'s Dep. 207:17–25. During her first week of classes in mid-January 2015, Penn Medicine allowed Briscella to have Wednesday and Thursday off for her clinicals, to have a later start time on Tuesday, and to make up the additional hours by working double shifts during the weekend on January 17 and 18, 2015, but did not allow her to switch back to the Second Shift. Pl.'s Ex. CC; Def.'s Ex. 10 at 2121, ECF No. 31-3; Pl.'s Dep. 207:17–25. After having received this accommodation, Briscella called out of these weekend shifts on short notice. Def.'s Ex. 10 at 2121, ECF No. 31-3. Penn Medicine then ceased efforts to accommodate Briscella's school

<hr>

[6] In Briscella's post-deposition certification she also claims to have made a complaint of race-based discrimination in December 2014 as a result of being denied the lead communication specialist position. However, this must be a typographical error because she did not learn of her non-promotion until November 2015.

schedule.  Pl.'s Dep. 211:8–20; 214:3–7.  After several months of struggling to maintain

acceptable attendance, Briscella chose to withdraw from her nursing program in April 2015.

Pl.'s Dep. 220:2–225:2.  While HR initially sympathized with Briscella and told her that she

would not have to pay back the tuition already spent, they eventually required her to repay the

tuition, because it was official policy to not forgive tuition for students who withdrew and Penn

Medicine had to apply it to her as they did to everyone else.  Def.'s Ex. 17 at 835, ECF No. 31-7;

Ex. 11 at 210–212, ECF No. 31-3.

From January to June 2015, Briscella allegedly continued to receive disparate treatment

and make complaints to management of racial discrimination and retaliation.  In January and

February, Briscella was issued written coaching for technical problems at her station that were

apparently beyond her control, and this record remained in her personnel file for the next year.

Pl.'s Dep. 247:1–251:21.  In January, February, and March, Briscella made additional complaints

to Stewart, Douglas, Zylstra, and Crowley that she felt she was being retaliated against for past

complaints and still felt she was being discriminated against on the basis of her race.  Pl.'s Ex. E,

¶ 4.  In response to her complaints to Zylstra in May 2015, Briscella was told "there is no place

in the company for a person like you."  Pl.'s Dep. 249:16–25.  Briscella also complained about

retaliation to Crowley on May 15, 2015.  Def.'s Ex. 10, at 2154-55, ECF No. 31-3.  During the

Spring of 2015 Briscella was screamed or yelled at, had her desk "banged on," and was treated in

an "unprofessional manner" by both Douglas and Stewart.  Ford Dep. 40:3–41:14; Smalls Dep.

46:26–47:22; Kelly Dep. 230:1–17; Norris Dep. 42:9–24; Thomas-Clark Dep. 52:13–54:7.

According to one coworker, Briscella was always non-confrontational, never in a bad mood,

and a happy-go-lucky person.  Ford Dep. 38:23–25, 43:22–25, 55:7–58:8.  While other "non-

favorite" employees were treated similarly, Briscella's treatment was, according to some

witnesses, more exaggerated or heightened during this period.  Smalls Dep.97:4–10; Norris Dep. 74:21–75:3.  Unsatisfied with the response from Zylstra, Briscella emailed Crowley about her complaints and asked for a meeting with Suzanne Sawyer, who was the Chief Marketing Officer for Penn Medicine at the time.  Def.'s Ex. 10 at 2154–55, ECF No. 31-3.

In September 2015, Briscella applied for a promotion to Lead Communication Specialist along with Ronel Montgomery, David Roberts, and Leonard Johnson, all of whom are Black. Zylstra Dep. 32:21–33:13.  Each candidate was interviewed by Zylstra, Douglas and Stewart who collaborated to decide on a candidate, however the final decision was up to Zylstra, who, like plaintiff, is White.  Zylstra Dep. 32:21–33:13, 8:9–13.  In mid-November Ronel Montgomery was chosen for the position after she had been Zylstra's and Douglas's choice; Stewart had chosen David Roberts.  Def.'s Ex. 25, ECF No. 31-7; Douglas Dep. 65:7–10; Zylstra Dep. 33:17–21; Stewart Dep. 35:3–7.  Although Montgomery was the newest Communication Specialist, Douglas and Zylstra believed she was the most qualified candidate based on her interview, work performance, and leadership qualities.  Douglas Dep. 67:10–69:5; Zylstra Dep. 31:15–22.  In contrast, Zylstra, Douglas, and Stewart believed that, although Briscella was a good Communication Specialist, she was not cut out for the lead position because she was less willing to be involved in technology upgrades, had been terse with colleagues, had performance issues with "Force-Outs" and "Short-Calls," struggled when working under pressure, and had a tendency to identify problems without context or solutions.  Douglas Dep. 68:2–9; Zylstra Dep. 39:17–40:3; Stewart Dep. 32:16–34:2, 35:5–7, 39:14–44:17.  When asked for an example of Briscella being quick to point out problems without facts, Douglas referenced Briscella's gender pay complaint.  Douglas Dep. 69:8–21.  Briscella's resume and cover letter also contained several misrepresentations and errors.  Def.'s Ex. 26 at 623–24, ECF No. 31-8; Pl.'s Dep. 24:17–

26:14.  In her most recent performance evaluation before applying for promotion, which occurred in 2014, Briscella had met or exceeded expectations in every area of her performance as a communication specialist.  Pl.'s Ex. F, at 7.  In 2011, she had received a recommendation letter from Zylstra that she handled pressure well and was an exemplary performer, which Zylstra stated held true during this time period.  Pl.'s Ex. G; Zylstra Dep. 12:19–13:12.

Briscella filed a Charge of Discrimination with the Equal Employment Opportunity Commission on November 19, 2015 and again on January 12, 2016.  Def.'s Ex. 30, 592–601, ECF No. 31-8.  Briscella then filed her first complaint in the present matter on February 8, 2016.  Pl.'s Compl., ECF No. 1.

## II.   DISCUSSION

### A.   Summary Judgment Standard

This motion is governed by the well-established standards of Fed. R. Civ. P. 56, as amplified by *Celotex Corp. v. Catrett*, 477 U.S. 317, 321 n.3 (1986).  An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party and a factual dispute is "material" only if it might affect the outcome under governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### B.   The Substantive Legal Standard

Briscella's discrimination and retaliation claims brought under Section 1981, Title VII, and the EPA are based on circumstantial evidence, typically subject to the burden shifting analytical framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993); *Ladd v. Boeing Co.*, 463 F. Supp. 2d 516, 524 (E.D. Pa. 2006) (holding that Section 1981 claims are governed by the same

framework as Title VII discrimination claims); *Marriott v. Audiovox Corp.*, 2006 WL 3805145 at *9 (W.D. Pa. Dec. 22, 2006) (applying same to EPA claim).

As a threshold matter, Penn Medicine argues that there is a "modified" standard for establishing a *prima facie* case of reverse-race discrimination within the Third Circuit, which Briscella has failed to address. The defense cites two district court decisions, *Petro-Ryder v. Capt. Jacqueline Pittman*, 2015 WL 8731623 (E.D. Pa. Dec. 11, 2015), *appeal dismissed*, (May 3, 2016), and *Jeffries v. Potter*, 2009 WL 423998 (D. Del. Feb. 19, 2009), but to the extent this argument would have any force, it requires an analysis of *Iadimarco v. Runyon*, 190 F.3d 151, (3d Cir. 1999), the controlling Third Circuit case. A close reading of *Iadimarco* does not support the position that the legal standard is meaningfully different in "reverse" race discrimination cases. To the contrary, the Third Circuit held that "the language of *McDonnell Douglas* itself clearly establishes that the **substance** of the burden-shifting analysis applies with equal force to claims of 'reverse discrimination.'" 190 F.3d at 158 (emphasis added). *Iadimarco* simply pointed out one obvious distinction—that the history of discrimination against minorities that gives rise to an inference of discrimination does not create the same inference where the plaintiff is not a minority.[7] Consequently, under the first prong of *McDonnell Douglas*, because by definition a White plaintiff cannot rely on a history of discrimination to establish a *prima facie* case, such a plaintiff must instead present "sufficient evidence to allow a reasonable fact finder to conclude (given the totality of the circumstances) that the defendant treated plaintiff 'less

---

[7] "[P]resumptions in the Title VII analysis that are valid when the plaintiff belongs to a disfavored group are not necessarily justified when the plaintiff is a member of an historically favored group. Accordingly, when a plaintiff who is a member of a favored group alleges disparate treatment, the courts have adjusted the prima facie case to reflect this specific context . . . ." 190 F.3d at 163 n.10 (quoting *Livingston v. Roadway Exp., Inc.*, 802 F.2d 1250, 1252 (10th Cir. 1986)).

favorably than others because of [his] race . . . .'" *Id.* at 163 (quoting *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577 (1978)).

The Court of Appeals specifically rejected a potentially more rigorous test adopted in some circuits, requiring the plaintiff to allege "background circumstances" that would support an inference of discrimination. *Id.* at 162-63. It emphasized instead that "[a]ll that will ever be required of a White-male plaintiff under this test is that he present sufficient evidence to support the reasonable probability of discrimination." *Id.* at 162.

This is consistent with the Third Circuit's approach to employment discrimination cases generally: the test for a *prima facie* case is not rigidly formulaic, but adaptable to the facts of the case. *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797-98 (3d Cir. 2003); *accord Jones v. School Dist. of Phila.,* 198 F.3d 403, 411 (3d Cir. 1999) ("[a] prima facie case cannot be established on a one-size-fits-all basis."). *See also Furnco*, 438 U.S. at 575 (finding that the *McDonnell Douglas* framework "was not intended to be an inflexible rule").

In short, *McDonnell Douglas* controls, the only difference being that an inference of discrimination against a White plaintiff cannot be presumed on historical grounds.

C. Plaintiff's Discrimination Claims

Briscella can establish a *prima facie* case of reverse-race discrimination by showing (1) she suffered an adverse employment action and (2) that a reasonable factfinder can conclude, given the totality of the circumstances, that Briscella was treated less favorably than other employees in the call center because she is White. *See Iadimarco*, 190 F.3d at 163. Evidence of the race of the employees involved in the adverse employment action is relevant, but not alone sufficient, to establish discrimination. *See id.* at 156.

If Briscella makes out a *prima facie* case, the burden would then shift to Penn Medicine to articulate a legitimate, non-discriminatory reason for the adverse employment actions, *McDonnell Douglas Corp.*, 411 U.S. at 802. If Penn Medicine does so, the question becomes one of pretext. *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

### 1. Briscella's Prima Facie Case of Reverse-Race Discrimination

There is no dispute that the first prong of Briscella's *prima facie* case has been met: she suffered three adverse employment actions: (1) the switch from Second Shift to First Shift, (2) the non-accommodation and subsequent tuition repayment, and (3) the non-promotion. But, Penn Medicine argues that Briscella has failed to produce sufficient evidence from which a reasonable juror could conclude that she was treated less favorably because she is White.

Briscella seems content to assume that her Counterstatement of Facts is sufficient by itself to establish her *prima facie* case, offering no specific argument as to why an inference of discrimination has been established. Pl.'s Resp. at 17. Despite Briscella's confidence about this first required element, I must independently determine whether *a prima facie* case is supported by the record.

In support of her discrimination claim, Briscella points to the following as persuasive evidence of reverse-race discrimination: (1) Briscella was the only White woman in her position and one of only two White employees out of the forty people employed by Penn Medicine in the call center; (2) Penn Medicine regularly hired 5-10 Black employees each year in response to turnover; (3) Penn Medicine has consistently promoted Black employees over Briscella; (4) her shift change was made to accommodate the wishes of a Black coworker; (5) she was not afforded the same schedule flexibility to attend classes as her Black coworkers; (6) a Black colleague was chosen for a promotion over her despite having less experience and fewer credentials; and (7)

"numerous other ways . . . in which she was treated disparately" detailed in her Counterstatement of Facts. Pl.'s Resp. at 17–18.

Based on my careful review of the facts set forth in the record, I conclude that Briscella's case is far from robust but that she has presented sufficient evidence from which a reasonable jury could find she has suffered adverse actions because she is White.

Much of the record presented for her *prima facie* case is weak evidence of racial discrimination. As the call center is located close to a predominantly Black community, the fact that the staff are mostly Black and that Briscella has been passed over for promotions in the past for Black colleagues holds little evidentiary value, particularly without any evidence that those colleagues were less qualified. Briscella received the same accommodations that she observed Black colleagues receive during her first week of classes and likewise provides no specific evidence of similarly situated employees. There is no definitive evidence in the record suggesting that Briscella's non-promotion was influenced by her race, particularly when Zylstra concurred with Douglas and Stewart that Briscella was not the right choice.

Further undercutting an inference of racial discrimination is that none of the five co-workers whose declarations intimated or explicitly claimed Briscella was racially discriminated against reiterated those claims in their deposition testimony. Rather, her coworkers pointed to other factors to explain Briscella's disparate treatment, explaining it was because she was not considered a "favorite," abruptly used paid leave, experienced personal differences with Douglas and Stewart, questioned decisions by management, and lacked a confrontational demeanor. Personal animosity, however, does not amount to racial discrimination. *See Nardella v. Phila. Gas Works*, 997 F. Supp. 2d 286, 295 (E.D. Pa. Jan. 30, 2014). What also surfaces in her

colleagues' deposition testimony is that Ronel Montgomery, who benefitted from the shift change and the promotion, was a favorite of management.

Nonetheless, there is at least some indication that Briscella was more frequently the target of criticism and that the HR representative was concerned by the racial make-up of the call center.[8]  Considering the totality of the circumstances, Plaintiff tenuously states a *prima facie* case.  But whatever hesitation I might have as to its adequacy, no further analysis is warranted, because even if one assumes a *prima facie* case has been established, Briscella fails to show pretext.

### 2.    *Penn Medicine's Legitimate Non-Discriminatory Reasons*

Assuming that the burden of production has shifted to Penn Medicine, Briscella's employer has provided sufficient evidence that it had legitimate justification for the three adverse employment actions.  First, Stewart explained that she switched Briscella to the First Shift because numerous requests to work the First Shift from 2013 to 2014 led her to believe that Briscella wanted to be on the First Shift.  Def.'s Mot. Summ. J. 10, ECF No. 31-1.  The record shows that Briscella had requested to work the First Shift approximately 28 times in 2013 and once asked for her schedule to be changed to the First Shift on the weekends.

Second, Penn Medicine did not continue to accommodate Briscella's class schedule because she called out of the shifts she was offered as an accommodation.  Def.'s Reply 14, ECF No. 41.  Penn Medicine gave Briscella days off and odd start times during her first week of classes in mid-January 2015.  In return, Briscella agreed to work two double shifts that weekend to make up the time.  However, Briscella then called out of work on both of those days.  It bears emphasis that these were double shifts on a weekend—particularly challenging times to schedule

---

[8] The location of the call center and lack of any labor pool data weakens, but does not completely negate, the probative value of Crowley's reaction as to the existence of racial discrimination.

replacements. The subsequent requirement that Briscella repay tuition after she withdrew from her program reflects a neutral application of the tuition policy, which requires repayment by any employee who withdraws prior to receiving a grade.

Third, Penn Medicine has provided evidence that it had a legitimate reason for not selecting Briscella for promotion to the Lead Coordinator position. Douglas and Zylstra both believed Montgomery was the best candidate because of her qualifications, interview, leadership qualities, and observations of how she had worked in the office. Def.'s Mot. Summ. J. 13, ECF No. 31-1. While not choosing Montgomery, Stewart also did not choose Briscella because she did not exhibit leadership qualities, had some performance issues over the past year, and had a propensity to point out problems without solutions. *Id.* Moreover, Briscella's application materials contained misrepresentations and typos. *Id.*

### 3. *Briscella's Showing of Pretext for Race-based Discrimination*

Briscella argues that to overcome summary judgement she need not prove discrimination but rather "demonstrate that a reasonable factfinder may disbelieve the employer's rationale for undertaking a particular adverse action." Pl.'s Resp. 17, ECF No. 39-1. In fact, Briscella must do more. Indeed, she must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764. But it is not enough to show Penn Medicine was wrong or mistaken; Briscella must show that the proffered explanation is so weak, implausible, incoherent, or inconsistent that it is "unworthy of credence." *Id.* at 765. Such disbelief, in combination with evidence from a *prima facie* case, *may* be sufficient to show intentional discrimination. *St. Mary's Honor Center*, 509 U.S. at 511. Briscella's ultimate

burden is to present evidence sufficient to permit a reasonable juror both to disbelieve Penn Medicine *and* to believe that the real reason was intentional discrimination. *Id.* at 511. While evidence exists that some of Penn Medicine's reasons for treating Plaintiff differently may have been personal, which is relevant to her retaliation claim, it does not support an inference of discrimination because proof is lacking that Briscella was treated differently because she is White.

Briscella states she has "systematically at each phase of her employment faced reverse discrimination" and that many of her coworkers corroborated the different treatment she received. Pl.'s Resp. 18, ECF No. 39-1. As reviewed above, though her coworkers confirmed that Briscella was treated slightly worse than her colleagues, they also refused to attribute any treatment to her race, even those who had signed pre-suit Declarations.

As to Plaintiff's change of shift, given the multiple instances where Briscella asked to have her normal Second Shift changed to First, the fact that her supervisors finally made a permanent change to First Shift simply cannot be viewed as racially motivated in the absence of some more direct evidence. Furthermore, the fact that the supervisors accommodated an obvious favorite of theirs who wished to homeschool her child might strike Plaintiff as unfair, but this alone hardly supports an inference of racial discrimination simply because the coworker who was accommodated is Black.

With respect to the alleged failure to accommodate the plaintiff in continuing her education, Briscella does not even address the fact that her request was initially granted—weighing against her claim of racial bias—and then, having *been* accommodated with two weekend double shifts, she called out of both. In the face of such problematic behavior,

conclusory allegations that other communications specialist who were Black were accommodated while Plaintiff was not simply do not suffice.

With respect to Plaintiff's failure to win promotion, the record is clear that a process was followed and that there were clear distinctions between the candidates. Moreover, regardless of her level of involvement with the call center, the ultimate decision-maker was White and ranked the successful candidate higher than Plaintiff.

This is not a case where the Plaintiff can prevail by relying upon inferences from the record. While evidence exists that Briscella may have been the target of managerial ire for her complaints, her *prima facie* case for racial discrimination is weak, and therefore more direct evidence of racial bias becomes necessary. Such evidence is lacking here. Simply put, Briscella falls far short of meeting her burden of persuasion under *St. Mary's Honor Center* of casting enough doubt about Penn Medicine's proffered reasons that a jury could find that the real reason was intentional racial discrimination. 509 U.S. at 511.

D.  Plaintiff's Retaliation Claims

For her retaliation claims brought under the Equal Pay Act, Title VII, and Section 1981, Briscella must establish a *prima facie* case showing (1) that she engaged in a protected activity, (2) that the employer took an adverse employment action against her, and (3) that there was a causal connection between the protected activity and the adverse employment action. *Moore v. City of Phila.*, 461 F.3d 331, 340–41 (3d. Cir. 2006). For any of her complaints to qualify as a protected activity, Briscella must show that she had an objectively reasonable belief, in good faith, that her complaint concerned a violation of the EPA, Title VII, or Section 1981.[9] *Id.* at

---

[9] Neither the Supreme Court nor the Third Circuit have spoken directly on the issue of whether an informal complaint to a private employer is a protected activity under the EPA. However, in the related context of the Fair Labor Standards Act, the Court of Appeals has held that the language of its anti–retaliation provision should be construed liberally. *Brock v. Richardson*, 812 F.2d 121, 123–24 (3d Cir. 1987). The same should be true here. *See*

340.  A complaint can be written or oral but must be sufficiently clear and detailed so that an

employer can understand it as an assertion of rights protected by the statute.  *Kasten v. Saint-*

*Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011).

### 1.  *Whether Briscella's Complaints Qualified as Protected Activities*

For the purpose of Summary Judgment, Penn Medicine admits that Briscella's complaints

for retaliation on May 15, 2015 to Crowley and for racial discrimination in May 2015 to Zylstra

were protected activities.  Def.'s Mot. Summ. J. 16, ECF No. 31-1.  Penn Medicine disputes that

Briscella's complaint at the end of May 2014 constituted a protected activity, arguing she only

complained that new employees, regardless of gender, were making a higher hourly wage.  *Id.* at

15.  However, the record shows that Briscella specifically complained that men who had just

been hired were making more money than her even though she had been an employee for many

years.  It is relevant that this complaint was made in the context of a comment from Douglas

indicating she had a  preference for male communication specialists.[10]  Moreover, Penn

Medicine's own HR representative testified that Briscella had complained about pay-based

gender discrimination in mid-2014.  Viewing the record in the light most favorable to the

plaintiff, I find that her May 2014 was a protected activity.

Penn Medicine also argues that I should disregard Briscella's post-deposition

certification, Pl.'s Ex. E, which asserts that she made complaints of racial discrimination to

Douglas and Stewart in August and September of 2014 and then again in January, February, and

March of 2015.  Def.'s Reply 5, ECF No. 41.  It takes this position because these dates were not

---

*Marriott v. Audiovox Corp.* 2006 WL 3805145 at *8 (W.D. Pa. 2006) (finding informal complaint under EPA
sufficient).

[10] While Douglas's statement that she wanted to hire men because they complained less is not admissible as
character evidence, it is relevant and admissible to show her state of mind in the context for Briscella's May 2014
complaint.

provided in response to its interrogatories, not supported with any other documentation, and the declaration purportedly contains inconsistent dates. *Id.* However, Briscella's declaration is within the scope of her complaint and her interrogatory answer, which consistently alleged making complaints "on multiple occasions" in late 2014 and several times in 2015. Pl.'s Am. Compl., ¶ 24, ECF No. 17; Pl.'s Ex. J at 7. While Briscella did not testify to this in her deposition, that is because Penn Medicine elected not to ask her any specific questions regarding the timing of her complaints. Taking the record in the light most favorable to Briscella, I will consider her declaration and find these complaints constituted protected activities. As a result, Briscella has established she undertook the following protected activities during the relevant time period: (1) her gender discrimination complaint in May 2014, (2) race discrimination and retaliation complaints in August and September of 2014 and in January, February, and March of 2015, (3) her retaliation complaint on May 15, 2015 to Crowley, and (4) her race discrimination complaint to Zylstra in May 2015.

### 2. *Whether Briscella Suffered Adverse Employment Actions*

To show she suffered adverse employment actions, Briscella must show more than trivial harm; she must show that the actions taken by Penn Medicine were sufficient to dissuade a reasonable worker from making a charge of discrimination or retaliation. *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Whether such actions were sufficient may depend on the "constellation of surrounding circumstances, expectations, and relationships" within which the employment actions were taken. *Id.* at 69 (internal quotation omitted). "Burlington strongly suggests that it is for a jury to decide whether anything more than the most petty and trivial actions against an employee should be considered 'materially adverse' to him and thus constitute adverse employment actions." *Estate of Olivia v. New Jersey*, 589 F. Supp.

2d 539, 543 n.7 (D.N.J. Dec. 18, 2008) quoting *Crawford v. Carroll*, 529 F.3d 961, 973 n.13 (11th Cir. 2008).

For the purposes of this motion, Penn Medicine admits that the shift change, tuition repayment, and non-promotion all constitute adverse employment actions. Briscella further argues that the "unwarranted discipline" she received from August 2014 through June 2015 also qualifies as an adverse employment action. Pl.'s Resp. 14, ECF No. 39-1; Pl.'s Count. Fact 15. Briscella then goes through a list of incidents, which she labels as evidence of "extreme antagonism." Pl.'s Count. Fact 15 ¶ 49. The list included: (1) the email to call center staff about pay complaints referring to her as "absurd," (2) unwarranted counseling for unprofessional conduct, (3) unwarranted written coaching for a performance issues called "Force-Outs," (4) the denial of her request to return to the Second Shift in early January 2015, (5) being told by Zylstra that "there is no place in the company for a person like you," (6) several occasions where Briscella was yelled at, was told she could not leave her desk, and had her desk "banged on," and (7) Penn Medicine's failure to timely investigate Briscella's discrimination and retaliation claims. Pl.'s Resp. at 9–10, ECF No. 39-1; Pl.'s Count. Fact 15–18. Such incidents, however unpleasant, do not qualify as adverse employment actions. As a result, I will consider them only in the context of causation below.

### 3. Whether Briscella has Shown Sufficient Causation

Briscella must show that the protected activity was a but-for cause of the adverse employment actions. *Univ. of Tex. v. Nassar*, 570 U.S. 338, 360 (2013). The two main factors in finding causation are (1) the temporal proximity between the protected activity and the adverse employment action and (2) whether there was a pattern of antagonism in the intervening period. *Abramson v. William Paterson College of New Jersey*, 260 F.3d 265, 288 (3d Cir. 2001)

(finding 13 days between complaint and termination insufficient). In addition to these main factors, a plaintiff may rely on a broad array of evidence to illustrate this causal link. *Farrell* v. *Planters Lifesavers Co.*, 206 F.3d 271, 283-84 (3d Cir. 2000). However, when relying on timing alone, the timing must be unusually suggestive to infer a retaliatory motive. *Williams v. Phila Housing*, 380 F.3d 751, 760 (3d Cir. 2004) (finding a two-month period between protected activity and termination not suggestive of retaliatory motive).

Here, the timing alone of the adverse employment actions is not unduly suggestive of retaliatory motive. The shift change occurred on August 25, 2014, roughly three months after Briscella complained of gender discrimination at the end of May 2014. The non-accommodation of her class schedule began towards the end of January 2015, but a jury could not conclude this action was related to Briscella's complaint because her allegations are not adequately specific. The non-promotion was decided between September and November 2015, roughly four to six months after Briscella's complaint to Zylstra in May 2015. However, as discussed above, Briscella has produced evidence of a pattern of antagonism from Douglas and Stewart. A reasonable factfinder could adduce from the email, unwarranted discipline, Zylstra's comment, yelling, and testimony from her coworkers that there was a pattern of antagonism towards Briscella. As a result, I find Briscella has established facts from which a reasonable factfinder could determine that her complaints were the but-for cause of her adverse employment actions.

Based on the above analysis, Briscella has produced sufficient evidence to establish a *prima facie* case of retaliation. As a result, my analysis now turns to whether Penn Medicine's proffered reasons are pretext for retaliation.

*4. Whether Briscella has Shown Pretext for Retaliation*

As Penn Medicine has already provided legitimate reasons for the shift change, tuition repayment, and non-promotion, Briscella's retaliation claims turn on whether she can meet her burden to show Penn Medicine's proffered reasons were pretext for retaliation. The pretext analysis here is the same for retaliation as it was above for racial discrimination. *Rhoades v. Young Women's Christian Ass'n. of Greater Pittsburgh*, 2010 WL 2991236 at *11 (W.D. Pa. July 27, 2010). If an employer offers several reasons for an adverse employment action, casting doubt on a fair number of them may impede the employer's credibility enough that a reasonable juror may disbelieve the remaining reasons. *Fuentes v. Perskie*, 32 F.3d, 759, 764 n.7 (3d Cir. 1994).

The critical difference between Briscella's discrimination and retaliation claims is the evidence in the record of retaliation in the call center generally and aimed specifically at Briscella. For two of the three adverse actions, a juror could believe that retaliation was the real reason based on the circumstances surrounding the adverse employment actions.

The exception is Penn Medicine's refusal to accommodate Briscella's class schedule because she abruptly called out of double shifts. Def.'s Reply 14, ECF No. 41. Briscella has not produced any evidence or argument that would call into question the legitimacy of Penn's reasoning.

As to the shift change and the failure to win promotion, questions exist as to whether Briscella was penalized for raising complaints. As noted above, many of Briscella's coworkers testified that they had observed her being treated differently than other employees, even non-favorite employees, in the call center. The office-wide email sent from Douglas immediately after Briscella made her gender discrimination complaint could be seen as a thinly veiled rebuke

aimed at her personally. At least two colleagues testified that Stewart and Douglas have "personal" issues with employees. Norris also testified that he observed Stewart likes to take things out on people she has issues with and that Briscella had been singled out because she questioned decisions made by Douglas and Stewart. Zylstra's comment in response to Briscella's complaints, that there was no place for Briscella at Penn Medicine, may not have been an idle threat; Douglas admitted that Briscella's gender discrimination complaint was at least one factor in her non-promotion. And Zylstra testified that a past recommendation she had written for Briscella, stating that Briscella handles all responsibilities of her position very effectively, still held true during this period. When viewed in their entirety, and in taking all inferences for the plaintiff, these facts are sufficient for a reasonable juror to infer that the real reasons for the shift change and the non-promotion were retaliatory.

## III.    CONCLUSION

Based on the foregoing, Defendant's Motion for Summary Judgment is granted in part as to Plaintiff's Title VII and Section 1981 reverse-race discrimination claims and denied in part as to Plaintiff's Title VII, Section 1981, and EPA retaliation claims.


                                        _____/s/ Gerald Austin McHugh
                                        United States District Judge